[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, David Levy, has appealed from the final decision of the Commission on Human Rights and Opportunities (CHRO), which was rendered by a hearing officer appointed pursuant to General Statutes 46A-84 to determine the issues raised by the complaint filed by the plaintiff with the Commission on May 23, 1983, pursuant to CT Page 1939 General Statutes 46a-82. A CHRO investigator had found probable cause for believing that a discriminatory practice had been committed by the plaintiff's former employer, the defendant, Entertainment and Sports Programming Network (ESPN). After a lengthy hearing, the hearing officer decided the ultimate issues in favor of ESPN, concluding that there were "legitimate non-discriminatory reasons for removing Mr. Levy from the road (in 1980), which reasons were still valid when ESPN denied Mr. Levy's application for the vacant remote operator/truck driver position posted in November 1982."
An essential predicate to the plaintiff's appeal pursuant to General Statutes 46a-94a is that he be a "complainant aggrieved by the dismissal of his complaint by the commission." The certified record does not contain any document expressly dismissing the complaint, but the CHRO has filed a "statement" that it has "determined that the respondent did not discriminate against the [plaintiff] on account of his physical disability in violation of General Statutes 46a-60(a)(1), and dismissed his complaint." (Court file). Thus it appears that the CHRO has adopted the decision of the hearing officer.
The facts found by the hearing officer are set forth in paragraphs 1-63 of Part II of the memorandum of decision. On January 3, 1980, the plaintiff began to work for ESPN as a remote operator/truck driver, despite its knowledge that his hearing was impaired. (Findings 1-2). In this position his primary responsibility was to drive a large specially designed truck containing broadcasting equipment to various locations from which sporting events were telecast. (Finding 3). At the site of the event, the plaintiff would assist the other ESPN crew members in setting up equipment for telecasting. (Finding 3).
For the plaintiff's position, ESPN required a road test and a written examination, both of which the plaintiff successfully completed. (Findings 4-6). He was not required to undergo a medical examination because he had a certificate of a physician dated October 31, 1979, that he was qualified to be a driver under the motor carrier safety regulations, but only when wearing corrective lenses and also a hearing aid. (Finding 7, Ex. 1). CT Page 1940
During the period of his employment as a remote operator/truck driver, January to April, 1980, the plaintiff was involved in three truck accidents: (1) he fell asleep while driving back from Providence, R.I. and another employee, Richard McDowell, after failing to awaken the plaintiff by shouting, had to grab the steering wheel to prevent the truck from veering off the road; (2) while backing the truck in Shreveport, La., the plaintiff struck a concrete overhang of a building and dented the truck after being warned to stop by another crew member; (3) at a gas station in Connecticut he struck an overhang that was too low for the truck. (Findings 8-10). During this period the plaintiff also caused damage to two television cameras in two separate incidents when he turned on cameras that had not been properly hooked up. (Findings 13-16). In the second incident, which involved the plaintiff's disobedience of an explicit instruction, an expensive camera was destroyed. (Finding 17). On another occasion it was discovered that the plaintiff had been driving a truck in Florida while the compressor governor, a component of the braking system, was broken. (Finding 19).
As a result of the destruction of the camera because of his failure to follow his employer's instructions, the plaintiff was suspended from his employment without pay for two weeks commencing April 5, 1990. (Finding 18). Richard McDowell, who was in charge of safety procedures for ESPN, was requested by Joseph Commare, the director of engineering with responsibility for remote operations, to evaluate the plaintiff's ability as a truck driver. (Findings 20-21). McDowell concluded from his investigation of the truck accidents that had occurred when the plaintiff was driving that he could not operate a truck safely. (Findings 22-23). On the basis of this report, Commare removed the plaintiff from his position as remote operator/truck driver and required him to undergo a medical exam by Dr. Bainbridge Hanley. (Findings 24-26). After an examination on April 21, 1980, Dr. Hanley refused to certify that the plaintiff was qualified as a truck driver under the motor carrier safety regulations because of his hearing deficiency, even when using a hearing aid. (Findings 27-32). Another hearing test was conducted at the University of Connecticut Health CT Page 1941 Center on the same date by an audiologist, James Dempsey, who was not a physician. (Finding 33). He certified that the plaintiff's hearing ability satisfied the regulations, although his report stated that the plaintiff had "a profound hearing loss in his left ear at all frequencies tested" and "a moderate to severe hearing loss for the right ear at 250-500 HZ, with profound hearing loss at higher frequencies." (Findings 33-35).
On April 29, 1980, Commare told the plaintiff that he was being transferred from his former position because of his hearing disability. (Finding 37). The plaintiff was assigned to a position as a studio technician at the same salary he had been receiving as a truck driver, which was greater than other studio technicians were then receiving. (F. 38). He was transferred on March 20, 1981 to the position of video tape editor. (Finding 39). In these positions he learned how to operate video cameras and edit videotapes. (Finding 9). When a notice was posted by ESPN in November, 1982, for a remote operator/truck driver job, however, the plaintiff applied for it without furnishing any new information about his qualifications. (Findings 43-45). Another person, who had extensive experience as a truck driver and mechanic, was selected for the position. (Findings 46-47).
On May 13, 1983, ESPN posted notice of another opening for a remote operator/truck driver position. (Finding 48). Although the notice did not so indicate, ESPN at this time was actually seeking a remote operator/video technician. (Finding 49). The plaintiff never applied for that position and it was filled by another person. (Findings 50-51).
The plaintiff applied for several other positions with ESPN for the purpose of obtaining a higher position with the company. (Finding 56). On July 28, 1982, he discussed his prospects of advancement with the personnel director, who arranged an interview for a position as a program cost estimator, but the person in charge of that department concluded that he was not suitable for that position. (Findings 52-55). The plaintiff's job performance began to deteriorate in February, 1983. (Findings 57-58). On one occasion he refused to re-edit a tape and walked off the job in the middle of his shift. CT Page 1942 (Finding 58). On June 4, 1983, he submitted his resignation to be effective on June 5, 1983. (Finding 59).
 I
The plaintiff claims that findings 31, 47, 50, 57 and 58 are not supported by the evidence.
 A.
"31. Dr. Hanley did not certify complainant as to the medical standards set forth in 49 C.F.R. § 41 et seq. because complainant failed the hearing portion of the exam. Ex. 14-C at page 3."
The exhibit referred to contains a note, "Hearing loss — streptomycin induced reaction at 18 mos. old. Both ears. Worse on left," and a comment, "Not able to hear a whisper at either 5 feet or ___ feet away (Facing the other way) (Very adept at reading lips)." Dr. Hanley signed the physical examination portion of the report just below this comment. He did not sign the certification form to indicate that he found the plaintiff qualified as a driver under the Motor Carrier Safety Regulations (49 C.F.R. § 391-41 — 391.49), 391-41(b)(11) of which requires that a person first perceive a forced whispered voice in the better ear at not less than 5 feet with or without use of a hearing aid." (Ex. 4-C, P. 5).
The plaintiff attacks the finding that he "failed the hearing portion of the exam" on the grounds that Dr. Hanley's wife administrated the forced whispered test and reported the results to the doctor and that his wife did not follow correct procedures in testing him.
Nothing in the regulations requires that a physician perform the hearing test for qualifications as a driver personally. It is common practice for a doctor to rely on test results reported to him by those in whom he has confidence. The plaintiff gains nothing, therefore, from the fact that Dr. Hanley's wife performed the hearing test.
The deficiencies in the testing procedure claimed CT Page 1943 by the plaintiff are that the forced whisper test was done at a distance of 20 feet, rather than 5 feet as 391.41(b)(11) specifies, and that a fan was blowing next to his right ear. The plaintiff was the only witness who testified about the testing procedure used. The hearing officer need not have credited his testimony, however, and could properly have relied on Dr. Hanley's statement in Ex. 14-C, p. 3 that the plaintiff was "not able to hear a whisper at either 5 feet or ___ feet away."
This is no basis for overturning finding 31.
 B.
"47. Mr. King was selected for this position because of his extensive experience as a truck driver and mechanic. Transcripts 469-472, 571-572, 574, Ex. 15 at pages 8, 12."
Mark Schumacher, who had been the crew chief in charge of the mobile unit for which the plaintiff had been the truck driver, testified that "the one area we were up on and very concerned about was the mechanical end that Tod King was extremely good at. He was extremely well trained and was just an excellent mechanic." (T. 470). He also testified that he would have chosen King for the position rather than the plaintiff even if the plaintiff had no physical disability. (T. 471).
Joseph Commare, who was in charge of all the mobile units of ESPN, testified that King "had gone to several technical schools on mostly mechanics and also on rebuilding diesel and regular conventional engines through the National Guard. He was also a highly qualified mechanic. . . . He also had a good driver's record." (T. 572). Commare testified also that "[w]e were looking for a very qualified driver plus a very qualified mechanic[;] emphasis on mechanics really." (Id.) He testified further that he had chosen King over the plaintiff for the job posted in November, 1982, because "King had a very extensive background in maintenance at that time, still does. He was qualified as a tractor trailer driver. . . ." Commare knew the plaintiff's background from the time he had worked as a truck driver from January to April, 1980, and "wasn't that happy with his driving background." CT Page 1944 (T. 587).
The plaintiff claims that the testimony of Schumacher and Commare is effectively refuted by the notice for the November, 1982 job, which does not mention an extensive mechanical background as a job requirement. The notice, however, does refer to certain "experience, knowledge or exposure" as "helpful," including "(B) fully experienced and schooled in the techniques of tractor trailer driving and automotive maintenance." (Ex. 11). Whether Schumacher and Commare were contriving the emphasis placed on Ring's mechanical background with the benefit of kind sight, when it was not a motivating factor at the time he was selected for the job, as the plaintiff claims, was a question of credibility to be decided by the hearing officer. Finding 47 is adequately supported by the evidence.
 C.
"50. Complainant never applied for this position. Tr. 318-319, 616."
The position referred to in this finding is that of "remote operator/video technician" for which a notice was posted on May 13, 1983, while the plaintiff was still employed by ESPN. (See Findings 48-50). Joseph Commare testified that ESPN at that time was seeking a video engineer technician, not a truck driver technician, for which the November 1982 job was posted (T. 566, 588-589). The notices for both jobs, however, were similar, except that: (1) the November 1982 notice (Ex. 11) stated that "some advance technical schooling with courses in radio/T.V. electronics" and "a minimum of 3 years audio/visual operator experience with emphasis in remote telecasting" is "preferred," while the May 1983 notice (Ex. 12) stated that such training and experience were "required," (2) the November 1982 notice also indicated that a "minimum of 5 years over the road tractor trailer driving experience and a Class 1 driver's license are preferred" while the May 1983 notice stated that "a Class 1 driver's license and tractor trailer driving experience is a plus;" and (3) the May 1983 notice omits any reference to being "fully experienced and schooled in the technique of tractor trailer driving and automotive CT Page 1945 maintenance," a qualification that the November 1982 notice characterized as "helpful."
The plaintiff testified that with respect to the November 1982 notice he "responded by going to Joe Commare and the second one (May 1983 notice) [he] responded just by following up; [he] responded formally on the first one, informally on the second." He also said that "[he] didn't know if that (May 1983) notice was a second posting or a continued posting of the first (November 1982) one; so, if it was still open [he] still thought [he] was qualified to do the job."
Joseph Commare testified that the plaintiff never applied for the May 1983 position. (T. 616). It was not unreasonable for the hearing officer to credit Commare's testimony rather than the equivocal testimony of the plaintiff that he had "responded . . . informally" to the May 1983 job notice without knowing whether it was a new position or a "continued posting of the first (November 1982) one."
 D.
"57. Mr. Levy's job performance began deteriorating several months prior to his resignation. T. 368."
This finding is supported by the testimony of Gerald Weed, who was the plaintiff's immediate supervisor when he worked as a tape editor after he had lost his position as a remote operator. Weed testified that, "during the last few months before the plaintiff's resignation, the plaintiff "was away from the department whenever he was supposed to be in there editing; the number of personal phone calls, a pattern started forming;. . . he would take a sick day either the day before his days off or the day after his days off." (T. 354). Weed testified further that "[a] couple of employees came to [him] with complaints that [Levy] was not doing his work there at night;" (Id.) and that there was "a noticeable decline" in the plaintiff's work, three or four months before he left." (T. 368).
E. CT Page 1946
"58. On February 20, 1983, Mr. Levy refused to re-edit a tape and subsequently walked off his job in the middle of his shift. (Ex. 14-C at pp. 29, 30, 32, 33; Tr. 291-298)."
William Lamb, the manager of technical operations, testified that a written complaint was made by Elliott Stern that the plaintiff had refused to re-edit a tape on February 20, 1983, as directed by his superiors, and left his job. (T. 292). As a result, the plaintiff was suspended without pay for eight days. (Id.) The exhibits referred to in the finding support this testimony.
The only basis for challenging this as well as the hearing officer's other findings is that the plaintiff testified differently. He claimed that he was constructively discharged because he could no longer endure the discrimination against him on the part of ESPN. "In determining whether an administrative finding is supported by `substantial evidence' the reviewing court must defer to the agency's assessment of the credibility of witnesses." Miko v. Commission of Human Rights and Opportunities, 220 Conn. 192, 200. The plaintiff's attack upon findings 31, 47, 50, 57 and 58 is wholly without merit.
 II
The plaintiff claims also that the hearing officer's findings regarding ESPN's reasons for removing and refusing to rehire him as a remote control operator are not supported by substantial evidence that ESPN actually considered these reasons when it performed the discriminatory acts claimed.
The hearing officer concluded that the plaintiff was removed from his original position as a remote operator because Joseph Commare, who was in charge of the remote units, concluded that the plaintiff could not safely operate a truck on the basis of the four incidents detailed in findings 8-10 and 19, which occurred during a period of four months, and also because of Commare's concern over the two incidents involving damage to cameras detailed in findings 13-15 that occurred during the same CT Page 1947 period. Memorandum of Decision pp. 26-28. This conclusion, or inference of fact, is amply supported by the evidence.
Joseph Commare testified that he had refused to rehire the plaintiff as a remote operator for the November 1982 job "because of his previous background and driving record" and "wasn't going to take another chance." (T. 625). Commare denied that the plaintiff had been removed from the remote operator position in April 1980 because of his hearing impairment per se but because "he had accidents with the truck" and Commare was "not about to have somebody killed." (T. 626). He testified that Dr. Hanley's refusal to certify that the plaintiff's hearing satisfied the minimum DOT standards gave him concern and "that, along with the plaintiff's driving record" convinced him not to bring the plaintiff "back on a truck again." (T. 634). After referring to the plaintiff's involvement in the two camera incidents, Commare testified that even if the plaintiff had no hearing impairment he would not have selected the plaintiff over the applicants chosen for the November 1982 and May 1983 jobs. (T. 636).
Commare's testimony was corroborated by Barry Black, the personnel director, that when the plaintiff was removed from his position in April 1980, "the reason given to me by the supervising department head, Joe Commare, at the time was based on his concern or the company's concern for the safety and well being of our employees and the public at large" and that this reason was supported by Dr. Hanley's report "indicating that Mr. Levy had not passed the required physical examination." (T. 521).
The claim that "ESPN produced no evidence that at the time of the plaintiff's removal it reviewed the plaintiff's driving record and found the plaintiff to be unsafe" (Practice Book p. 26) wholly ignores the testimony cited as well as that of other witnesses, such as Rick McDowell, who testified that Commare requested his opinion of the plaintiff's driving ability, which McDowell had been requested to investigate, and that his opinion was that the plaintiff could not safely operate a truck based on the accidents that had occurred. (T. 698-99). There is no substance to this claim of error. CT Page 1948
 III
The plaintiff's remaining claim is that the hearing officer "misapplied the standards and burden of proof in this `mixed motive' case." (Practice Book p. 16).
In her decision the hearing officer first rejected the claim of ESPN, raised at the conclusion of the plaintiff's presentation of evidence but reserved for a later decision, that no prima facie case had been established by the evidence. (Memorandum of Decision pp. 11-12). Following the model delineated in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973), she concluded that for the purpose of raising the prima facie presumption of discrimination, the plaintiff had presented sufficient evidence that (1) he was a member of the class protected by G.S. 46A-60(a) as a result of his hearing disability; (2) he had applied for and was qualified for the position of remote operator/truck driver from which he was removed in April 1980 and which he claimed to have sought in November 1982 and May 1983; (3) he had been denied reinstatement in this position on those three occasions; and (4) at least one of these denials occurred "under circumstances which give rise to an inference of discrimination" in that ESPN had made several statements indicating that the plaintiff's hearing disability disqualified him from driving a truck. (Memorandum of Decision pp. 13-17). Having determined that the plaintiff had established a prima facie case of discrimination, the hearing officer, after reviewing all the evidence presented, concluded that ESPN had "articulated a legitimate, nondiscriminatory reason for transferring complainant into a studio position at equal pay" and that "[t]he prima facie case has been rebutted." (Memorandum of Decision pp. 32-33). The reason referred to was ESPN's "concern for safety and dependability in its remote operations." (Id.) She also concluded that the plaintiff "has not met his burden of proving by a preponderance of the evidence that the reasons for the rejection were a pretext for discrimination." (Memorandum of Decision p. 33).
The principal basis for the plaintiff's claim of a misapplication of the "standards and burden of proof" is a single sentence in the memorandum of decision, as follows: CT Page 1949 "The defendant need not persuade the court that it was actually motivated by the proffered reasons." (Memorandum of Decision pp. 24-25). This statement, however, despite the omission of appropriate punctuation, is quoted directly from Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The same quotation is paraphrased, with apparent approval, in Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 61 (1982) as follows: "The employer need not, however, `persuade the court that it was actually motivated by the proffered reasons.'" This approach, the plaintiff claims, is inconsistent with the plurality decision in Price Waterhouse v. Hopkins, 490 U.S. 228, 252 (1989) that "[a]n employer may not . . . prevail in a mixed motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decisions." Viewed apart from the context of each case, the quoted statements from Texas Department and Price Waterhouse are inconsistent. It must be borne in mind, however, that in Texas Department the court was referring to the employer's obligation with respect to advancing reasons for the employment decision sufficient to refute the inference created by the employee's prima facie case, which, in the absence of legitimate employment related reasons for denying the employee application, would require judgment for the employee. Texas Department of Community Affairs v. Burdine, supra, 254-56, n. 10. In Price Waterhouse, however, the court was referring to the ultimate decision on the merits of the claim of unlawful discrimination, not to the minimal requirements for rebuttal of the presumption arising from the employee's prima facie case. Price Waterhouse v. Hopkins, supra, 252. "The employer . . . must show that its legitimate reason, standing alone, would have induced it to make the same decision." Id. "[T]he better rule is that the employer must make this showing by a preponderance of the evidence." Id. The significance of Price Waterhouse is that it did impose the ultimate burden of proof on the employer in a mixed motive case to establish that more probably than not legitimate employment concerns were the reasons for the challenged employer decision, a burden that in Texas Department had been left to the employees: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas CT Page 1950 Department of Community Affairs v. Burdine, supra, 253; see Price Waterhouse v. Hopkins, supra, 286-87 (Kennedy, J., dissenting); Ap. 260 (White, J., concurring).
In this case the memorandum of decision does not explicitly state that the ultimate burden of proving that legitimate employment concerns actuated the challenged employment decisions was allocated to the defendant ESPN. It does, however, declare that "the respondent must now articulate a legitimate non-discriminatory reason for the complainant's discharge" in order to rebut the presumption arising from the prima facie case proved by the plaintiff. (Memorandum of Decision p. 25). The hearing officer also concluded that ESPN had sustained this burden: "[T]he respondent has articulated a legitimate, nondiscriminatory reason" for removing the plaintiff from his truck operating job. (Memorandum of Decision, p. 32). Satisfying the burden of articulation, nevertheless, is not equivalent to sustaining the ultimate burden of the risk of nonpersuasion that Price Waterhouse imposes on employers in mixed motive cases.
The absence of an express allocation of the ultimate burden of proving legitimate reasons for ESPN's decision not to employ the plaintiff as a truck driver after April 1980, is of little consequence in this case, because the memorandum of decision prefaces the numbered findings of fact with the statement that those facts "have been proven by a preponderance of the evidence." This standard means that the evidence supporting a particular finding was more convincing, in the view of the hearing officer, than the contrary evidence. Findings 22 and 24 indicate that McDowell's conclusion that the plaintiff could not safely operate a truck was based on the plaintiff's driving history, not on his hearing impairment, and "would have been the same for any driver with the same driving history." (Memorandum of Decision, p. 6). Finding 24 states that Commare removed the plaintiff from the remote operator position on the basis of McDowell's investigation "and for public safety reasons," a plainly justifiable employment concern. (Id.) These findings, being based upon a preponderance of the evidence signify that the hearing officer viewed the conflicting evidence on these critical issues as preponderating in favor of ESPN. Thus, she implicitly CT Page 1951 concluded that ESPN had sustained its burden of persuasion, as required by Price Waterhouse in mixed motive cases. Accordingly, she had no occasion to apply the corollary aspect of the burden of proof principle, that if the evidence is in equipoise, the issue must be resolved against the party bearing that burden. The memorandum of decision makes it quite clear that the hearing officer found ESPN's evidence on these issues to be more persuasive than that of the plaintiff.
Although the memorandum of decision implicitly indicates that the burden of proof requirements of Price Waterhouse have been satisfied, this case is not a mixed motive case in the sense of that term as used in Price Waterhouse. There the trial court concluded that a wholly illegitimate consideration, sex stereotyping, had been a factor in the decision to deny the employee her advancement to a partnership. In this case the hearing officer found that Commare had told the plaintiff that he was being removed from his position as a remote operator "because of his hearing disability." (Memorandum of Decision, p. 8, Finding 37). Adequate hearing, however, was a bona fide job qualification for the position of remote operator, as a hearing test is part of the physical examination performed by the physician who must certify that a truck driver is physically qualified. 49 C.F.R. § 391.41(b)(11). The examination performed by Dr. Hanley in April 1980 indicated that the plaintiff's hearing was so deficient that he could not pass the prescribed tests. The plaintiff never was able to furnish a certificate from any physician indicating that his hearing, even with the use of a hearing aid, met the federal requirements. (Memorandum of Decision, pp. 29, 31). The concern expressed by Commare and others about the plaintiff's hearing disability was that it might have been a factor in the driving mishaps of the plaintiff as the testimony of several witnesses indicated. (Memorandum of Decision, p. 6, Finding 26; T. 681, 440). Such a benign safety-related motivation is clearly distinguishable from the unquestionably sexist concerns involved in Price Waterhouse.
The conclusion of the hearing officer that "[T]here is no evidence of stigmatization or discrimination on account of Mr. Levy's hearing disability," except as it CT Page 1952 related to his qualifications as a truck driver, signifies the absence of any unlawful motivation on the part of ESPN based on the plaintiff's disability per se. (Memorandum of Decision, p. 36). Accordingly, this case may be regarded, not as a mixed motive case, but simply as one in which the hearing officer concluded that the plaintiff had failed to prove any improper motivation for the decisions of his employer that he challenges.
The court concludes that there has been no misapplication of the standards for allocating the burden of proof in this case and that the decision of the hearing officer should be affirmed.
 IV.
In view of the conclusions reached in Parts I, II and III of this opinion rejecting the plaintiff's claims of error, it is unnecessary to discuss the alternative grounds raised by ESPN as a basis for dismissing the appeal.
It is ordered that judgment enter dismissing the appeal.
David M. Shea State Trial Referee